ISAAC HEFFRON AND GALVESTON CEMENT PIPE WORKS V.
CITY OF GALVESTON.

Decided June 12, 1903.

**Dedication—Market Square—Acceptance—Trespass to Try Title.**

A company owning land laid off by it for a city dedicated certain blocks
for a public market, and so designated them on its maps, sold lots with refer-
ence to the maps, and continuously recognized the right of the public to such
blocks for over forty years, with the exception of an order of its board of
directors, made seven years after the dedication, purporting to rescind the
dedication. There was no formal acceptance by the city, but from the original
dedication it had for more than forty years recognized its obligation to take
and preserve the property for the use to which it was dedicated, and claimed
it and leased it as public property, but had never established a public market
thereon. Held, that the title was vested in the city, and it could recover the
property in trespass to try title against a third party who was a trespasser
thereon.

Appeal from the District Court of Galveston. Tried below before
Hon. Robt. G. Street.

*Gresham & Gresham,* for appellant.

*J. Z. H. Scott* and *P. A. Drouilhet,* for appellee.

GARRETT, CHIEF JUSTICE.—This was a suit of trespass to try title
brought by the city of Galveston against Isaac Heffron and the Galves-
ton Cement Pipe Works for the recovery of a part of the south half of
block 568 in the city of Galveston. Heffron filed a disclaimer, and the
pipe works answered by general demurrer, special exceptions and plea
of not guilty, and set up title acquired by limitation against the Galves-
ton City Company. A jury was waived and the cause was submitted
to the court, and judgment rendered in favor of the city of Galveston
for the property in question and the sum of $185.25 rents.

By the first error assigned the defendant seeks to question the author-
ity of the city of Galveston as a legally constituted body under the
laws of the State to maintain this suit. The precise question was de-
termined by the Supreme Court in the case of Galveston & W. Ry.
Co. v. City of Galveston, 96 Texas, 520, 7 Texas Ct. Rep., 489, re-
cently decided, and it is unnecessary to do more than to refer to that
case.

The claim of the city to the property in controversy grows out of
the alleged dedication of it by the Galveston City Company for the
purposes of a public market. The original petition was filed on Jan-
uary 13, 1897, and the case went to trial on the plaintiff's amended
original petition, filed December 18, 1902. The petition alleged that
on the 22d of April, 1840, the site of the city of Galveston was owned
in undivided interests by a large number of persons associated and
organized as a joint stock company under the name of the Galveston

City Company, who committed the management of such property to a board of directors chosen by themselves; that thereafter, on the 5th day of February, 1841, said association was incorporated under an act of the Congress of the Republic of Texas; that said Galveston City Company had surveyed, subdivided and platted said lands as a site for the city of Galveston, and has ever since sold its lots and blocks to purchasers according to such maps; that they caused a survey and plat to be made of the site in 1839, in 1843, and in 1845; that upon said maps the entire south half of block 568 was conspicuously indicated as a public market, and as such dedicated for the use and benefit of the public; that on the 22d day of April, 1840, the Galveston City Company, by its board of directors, who were by it thereunto duly authorized, and by entry on their minutes, ordered that the said south half of block 568 be reserved for a market, and that it be conveyed by the agent to the corporation of the city of Galveston, "to be used only for the purpose of market places for the public convenience," and that ever since that time "said company, has generally and publicly recognized and adopted and advertised said maps as authentic and authoritative, and said dedication and order to that effect as complete and final, and has sold and disposed of the greater part of its said lands according to, and by reference to, said maps to purchasers who made their purchases with reference to said map, plat and dedication, and relying upon their binding force and effect;" that plaintiff is empowered and authorized especially "to take, hold and use lands and other property for corporate and public purposes and to acquire by donation or otherwise and establish and maintain public markets, market places and other public grounds and places in said city."

That plaintiff "on the 5th day of January, 1844, as agent and trustee of the public and the inhabitants of the city of Galveston, and in the exercise of its corporate functions and capacity, accepted said dedication and took charge and possession of said property for preservation, improvement and use as a public market, as and when the need of the city might require, and thereby, and by law, was vested with the ownership, control, management and right of possession and use thereof, in trust for the use and benefit of the public generally, and more especially the inhabitants of the said city of Galveston; that by said acts, conduct, admissions and dedication by the Galveston City Company and by plaintiff's acceptance thereof, and by law, plaintiff became and still is the owner of said property as trustee for public use, has accepted and still holds the trust as aforesaid, and that the property is now and has ever been since January 1, 1840, grounds which belong to the city of Galveston, and which have been as aforesaid donated and dedicated for public use to said city of Galveston by the owner thereof, and laid out and dedicated to public use in said city as hereinbefore set forth."

The title to the present site of the city of Galveston, under grant by the Republic to M. B. Ménard, of January 25, 1838, made by virtue of an act of Congress of the Republic of December 9, 1836, was, on and

before the 22d of April, 1840, vested in Menard and his associates, composing a joint stock company, under the name of the Galveston City Company, organized for the purpose of establishing a city thereon; and this company was, on the 5th of February, 1841, by act of Congress of the Republic, duly incorporated. At a meeting of the stockholders April 13, 1838, it was duly ordained that "the care and control of the entire interests and property embracing the league and labor of land upon which the city is placed" should be vested in a board of directors, who should have the power "to lay off the whole of the land belonging to the shareholders into lots of such size as they may deem proper, and to sell and convey" such portion and at such prices as the board may deem advantageous; that the directors shall appoint an agent who "shall attend personally to carrying into effect the foregoing * * * under the order and direction of the board, and * * * contract for making a survey.

The property was to be represented by 1000 shares, and the trustees in the agreement were to hold the title to the land subject to the orders of the shareholders as adopted in their general meetings and the rules and regulations prescribed by them. The trustees were authorized to make conveyances when they might be required by the stockholders at their general meetings, and also authorized to appoint agents for the sale of the shares.

On April 14, 1838, at a meeting of the shareholders, ordinances for the future government and management of the rights and interests of the shareholders of the company were adopted. Under these ordinances the board of directors were authorized to lay off the whole of the land belonging to the shareholders into lots of such size as they might deem proper, and to sell by deed in fee simple such portions of said lots or land as they might deem advantageous. The ordinances did not authorize the directors to make donations of the lots. It was also made the duty of the board of directors to require from the trustees of the company a deed of conveyance in proper legal form for all the land held by them in trust for the Galveston City Company so as to vest the title for the same in the said board of directors, and by resolutions they were instructed to make application to have the company incorporated. At a meeting of the board of directors held in 1838, prior to the incorporation of the Galveston City Company, the city was directed to be surveyed by John D. Groesbeck, who was paid for his services in January, 1839, and in February or March of that year Sandusky was employed to make a map of the city in accordance with that survey. This plat or map was adopted by the shareholders of the Galveston City Company on November 11, 1839. The books of the company show that on November 12, 1839, at a shareholders' meeting a resolution was passed setting aside certain property for public purposes; and that at a directors' meeting an order was made on April 22, 1840, before the incorporation of the company, which reserved for a market place the south half of block 568 and other lots to be conveyed by the company's

agent to the corporation of the city of Galveston, to be used only for the purpose of a market place for public convenience. An act of Congress incorporating the Galveston City Company was passed February 25, 1841. The Sandusky map of 1839 was lost, but there was another Sandusky map of 1843, which is now in the office of the city company, and from which there was a lithograph copy made in 1845. There is a reference on the margin of this map, "Market Square in block 560, 568 and 611."

On April 30, 1841, shortly after the incorporation of the company, Gail Borden made to the directors a report of all transactions of the organization from 1839 down to that date, making no mention, however, of the reservation or dedication of the south half of block 568 for market purposes. On February 12, 1847, at a meeting of the directors of the city company, an order was entered rescinding the dedication of the south half of block 568 and other lots for market and other purposes. At a meeting of the directors held on December 17, 1856, there was a report made in which was given a history of the company's transactions to that date. This report nowhere refers to the south half of block 568. Extracts from the minutes of the proceedings of the Galveston city council of January 28, 1878, show that the market committee recommended the erection of a market house on the property in question, and an ordinance was introduced for the issuance and sale of city bonds for that purpose. Plans for a market house and bids for its construction were advertised for, but the bonds were never issued and the house was never built. In 1875 several communications were made to the city council for permissions to lease this half block. At a meeting of the council on April 16, 1877, the committee on public property reported that this property had been built upon and was occupied by parties for several years, who had not paid rent since 1873 and 1874, and resolutions were adopted fixing the rate of rent and requiring the execution of written leases for the property. In 1879 the city council passed a resolution that until such time as the city is in a financial condition to erect a market house on the property, the mayor be authorized to lease the same. Action was also had July 17, 1882, with respect to terminating the permission of the city for parties to lease this ground, and fixing the price of the lease of the different lots. The Sandusky maps of 1843 and 1845 have been recognized by the Galveston City Company as authoritative, and sales by that company of lots and blocks in the city of Galveston have been made with reference to these maps, which are kept in the private office of that company.

The city for many years has maintained market houses on blocks 560 and 611 which were donated to the city for public markets by the shareholders of the joint stock company, but has never erected a market house upon the south half of block 568, or used it for market purposes. A book of the Galveston City Company giving a tabulated statement of lots and lands donated to the city of Galveston and others was put in evidence, which contained an entry in the handwriting of J. P. Cole,

who was the agent of the company from 1854 to 1886, marked opposite the south half of block 568, "See order of board of directors, April 22, 1840;" but this entry does not appear upon an older book from which this seems to have been copied. The present secretary testified that there is nothing in the records of the company as to the property in dispute except the order of April 22, 1840, reserving it for dedication, and the rescinding order of 1847. No other disposition has ever been made by the city company of this property. It has never assessed it or paid any taxes thereon, and it recognizes and confirms the dedication of the property as it appears on the map. Three-fourths of its property has been sold by the company, and all sales have been made in accordance with and by reference to the Sandusky map. The annual financial statements of the city of Galveston from the year 1870 to 1881 included this half block as public property, with a valuation set opposite it, and these reports were adopted by the city council and published in the newspapers. There is nothing in the records to show an acceptance by the city of Galveston of the dedication of this property on the 5th of January, 1844, as alleged in plaintiff's petition. The Groesbeck map which was adopted by the city does not show that the south half of block 568 was reserved or dedicated for a market, and the report of the committee to the city council in 1854 on the state of public property, including lots and blocks donated to the city for public use, agreeable to the plan of the city as exhibited at the first sale of property, nowhere referred to the south half of block 568 as belonging to or claimed by the city.

The defendant Heffron got possession of the property in controversy, claiming the improvements thereon by purchase from the estate of Hendricks. He either did not purchase the improvements until 1889, or, if he bought earlier, he continued to pay rent to the city in the name of Hendricks' estate after that date. Hendricks got the improvements from Spalding, who paid rent to the city. Heffron sold only the improvements to the pipe company and has disclaimed as to the land.

By the second, third and ninth assignment of error the defendant contends that in an action by the city to recover the property claimed to have been dedicated for the purpose of a market place for public convenience the city must allege and prove a legal title to the property, or must show possession and use thereof for the purpose for which the dedication was made, and deprivation thereof.

The facts alleged and proved showed the purpose of the city company to dedicate the property in controversy to the city of Galveston for use as a public market. The nature of the dedication was such that it was not necessary for the city to show an acceptance, since the company designated the ground on its map in which the city of Galveston was divided in lots and blocks, and had sold lots with reference to such designation. The public had an interest in the dedication, and it was the duty of the city, representing the public, to preserve and administer the property and prevent it from being misappropriated. It is true

that the city company had not been incorporated at the time it laid out the city and ordered the dedication of the property, yet the acts of the company subsequent to incorporation showed ratification; and at the time of the attempted rescission in 1847 the company had lost its power to rescind the order by which the property was reserved for dedication. The city company ever since the rescinding order has recognized the original dedication, and does not claim the property. It has never rendered it for taxation, or paid taxes thereon. The city has continuously for more than forty years recognized its obligation to take the property and preserve it for the uses to which it was appropriated by repeated acts of the city council, and claimed it and leased it as public property. The setting apart of the property as a public market did not require the immediate erection of a building in which produce and meats should be exposed for sale, or call upon the new city to formally accept the dedication. Property or lots intended and set apart for such purposes may lie for years before the growth of the town or the needs of its inhabitants will bring them into use; and the nature of the use as a market place for the vendors of meats, vegetables and other table supplies for daily consumption does not create the necessity of erecting an expensive building in order to manifest a use. It seems to us quite clear from the evidence that the city has always treated the property in controversy as a trust for the purpose of its original dedication, preserving it for use when the growth of the city might demand it, and that for more than sixty years the action of the city company has been consistent with such dedication, for although at one time it undertook to revoke the dedication, it took no steps to reclaim the property, or to assert any right thereto either by assessing it for taxes or offering it for sale.

There is no controversy here about the purpose to dedicate or the acceptance of the dedication between the city company and the city of Galveston. The question is whether the city has shown a title upon which it can maintain the suit. A deed was not necessary; nor was a formal acceptance by the city necessary. The purpose to dedicate, and the sale of lots with reference to a plat showing such dedication and a continuous recognition of the right of the public on the part of the city company, and an acceptance thereof by the acts of the city, were shown, and these acts put the title in the city, to be preserved for the use of the public, and upon such title the suit was properly maintained.

No other questions have been raised by any proper assignments accompanied by statements so as to require our attention, and finding no error, the judgment of the court below is in all respects affirmed.

*Affirmed.*